**Kareem Dawud FARRAKHAN, Plaintiff,**

v.

**MUTUAL OF OMAHA, Defendant.**

**Civ. No. 79–0–108.**

United States District Court,
D. Nebraska.

Dec. 23, 1980.

Robert E. O'Connor, Jr., Omaha, Neb., for plaintiff.

George C. Rozmarin, Omaha, Neb., for defendant.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court subsequent to a trial without a jury.

This lawsuit is an employment discrimination action brought under 42 U.S.C. § 1981 and § 2000e. The plaintiff's complaint alleges that the defendant's refusal to hire him was based solely on consideration of the plaintiff's race, color, and reli-

gion. The plaintiff further contends that the defendant's refusal to hire him was retaliatory conduct prohibited by federal law. For the reasons discussed below, the Court finds that the defendant's actions did not violate the plaintiff's federally protected rights.

*Findings of Fact*

1. The plaintiff is a black male. He has a Bachelor of Science degree from the University of Arizona where he majored in sociology. After his graduation, the plaintiff has had short periods of employment with Sears, Roebuck & Co. and the Prudential Insurance Company. Both of these jobs involved some type of sales work. While employed at Prudential, the plaintiff obtained state licenses to sell various types of insurance. The plaintiff has not been employed since August of 1977 when he left Prudential [Tr. 5–9, 20–23, 27].

2. On August 31, 1977, the plaintiff applied with the defendant for the position of small group sales representative [SGSR]. Prior to being interviewed, the plaintiff completed an employment application form. This application has been offered into evidence [Ex. # 1]. Notwithstanding the plaintiff's testimony to the contrary, the Court finds that the exhibit offered into evidence by the defendant is in fact the application completed by the plaintiff. This finding is based on a comparison of the plaintiff's signature in the application and in his EEOC charges, and on the testimony concerning the defendant's processing of the application [Tr. 47, 85–87, 140–41, 143, 159; Exs. # 1, # 6, # 7, # 8].

3. The plaintiff's application for employment with the defendant lists the plaintiff's prior work experience. Included on this list is the plaintiff's employment with Sears from June, 1975, to January, 1976, and with Prudential from January, 1977, to August, 1977. The plaintiff states in his application that his reasons for leaving these jobs was termination [Ex. # 1].

4. The application was referred along with the plaintiff to Michael L. Faust, an employment interviewer responsible for SGSR interviews. While interviewing the plaintiff, Faust made notes on an Employment Interview Guide sheet. This form was rewritten in a more legible manner immediately following the interview [Tr. 135, 140, 144; Ex. # 4].

5. The plaintiff's interview with Faust lasted approximately thirty minutes. During that time, Faust made a variety of observations about the plaintiff's general demeanor and employment qualifications [Tr. 166].

Faust greeted the plaintiff in the reception area. His first impression of the plaintiff was not good because of the plaintiff's attire. In Faust's opinion, the plaintiff was dressed too casually for SGSR. The plaintiff wore slacks and a sport coat which did not · match, and a "penguin"-type nylon shirt. Faust, however, testified that the plaintiff's attire was not a major barrier to employment [Tr. 145; Ex. # 4].

As a matter of course, Faust asked the plaintiff why he had been terminated at Prudential. The plaintiff was unable to clearly communicate to Faust the reason for the termination. The plaintiff had difficulty reconciling the reason for his termination with his claim that he had been a successful salesman. After some discussion, Faust concluded that the plaintiff had in fact sold a relatively large number of policies. These policies, however, were small and did not generate enough premiums to cover his salary. The plaintiff was thus terminated for failing to sell sufficient dollar volume [Tr. 146–47; Ex. # 4].

Faust also asked the plaintiff why he had been terminated at Sears. The plaintiff explained to Faust that he had had difficulty determining a reason for his termination. Although Sears had told him the reason was "insubordination," the plaintiff told Faust that he felt that the actual reason was discrimination. The plaintiff also volunteered that he had sued Sears for employment discrimination. [Tr. 147–48; Ex. # 4].

The matter of the plaintiff's insurance licenses was also briefly discussed. Faust, however, did not feel these licenses were

relevant to an assessment of plaintiff's qualifications. Such licenses were not required to be a small group sales representative, and did not evidence an ability to sell insurance [Tr. 148–49].

Although most of the interview time was spent reviewing the plaintiff's work history, Faust did describe in general the duties of an SGSR. As Faust described each aspect of the position, the plaintiff responded by saying "Beautiful."

Faust did not discuss any other positions at Mutual with the plaintiff. Faust felt that there were no jobs for which the plaintiff was qualified and which paid Nine Hundred Dollars per month, the salary plaintiff said he must have to survive [Tr. 150–51, 152–53; Ex. # 4].

6. Part of the standard procedure of Mutual's personnel department is to give each applicant an aptitude test. Pursuant to this standard procedure, Faust directed that the plaintiff be given an aptitude test. The results of this test were of limited relevance to hiring for the SGSR position, since ability to sell was of paramount importance. Faust testified that regardless of results of this test, he would not have altered his judgment of the plaintiff's qualifications for an SGSR position [Tr. 155–56, 179, 181].

7. Before discussing Faust's assessment of the plaintiff's qualifications, it is necessary to briefly review the duties of an SGSR and the qualifications for the position.

A small group sales representative is responsible for promoting the sale of small group business insurance. The typical duties of a representative may be summarized as follows:

1. Promotes sales of small group business. Visits General Agencies and group offices and explains program to General Agents, District and Unit Managers.

2. Conducts Small Group Sales meetings at the agency level. Explains the details of the Small Group program such as commission and bonus pay-

ments, Small Group underwriting, use of Small Group rates, various administrative forms, effective ways of prospecting and selling, servicing procedures, etc.

3. Trains managers and agents to sell Small Group business. Makes calls with agents on prospective customers, demonstrates sales approach and closing techniques, observes and critiques performance of agent.

4. Works with field office personnel regarding any problems of Small Group, e. g. internal administration, external procedures, servicing and persistency problems, etc.

5. Assists in the preparation of promotional material, participates in writing of sales letters, brochures and visuals, etc.

6. Corresponds with the field on various sales matters.

[Ex. # 2]. These tasks are performed without constant supervision by a superior. The SGSR's primary function is to persuade people to buy business insurance and to motivate salespersons in the field to sell the insurance. Although this position entails a certain amount of non-sale duties, it is basically a sales position [Tr. 138–39, 177; Ex. # 2].

Since the SGSR is basically a sales position, the primary attribute which an SGSR applicant must possess is a sales aptitude. One of the factors considered in assessing sales aptitude was the applicants' ability to sell themselves. The defendant also relied heavily on the applicant's past success at sales jobs. It is, however, clear that related job experience was not a prerequisite to employment.

In addition to sales aptitude, the defendant was looking for applicants who possessed: (1) communications skills, (2) professional demeanor, (3) aggressiveness, (4) intelligence, and (5) self-motivation. These specific characteristics are actually just attributes of a good salesperson. A salesperson must have good communications skills and must be aggressive. Similarly, professional demeanor and intelligence are espe-

cially necessary for SGSR, since the product being sold is business insurance. Finally, self-motivation is required, since an SGSR is not subject to close supervision. Without self-motivation an SGSR would not succeed at his sales tasks [Tr. 138–39, 163, 165–67, 175–77, 184, 228, 238–39; Exs. # 2, # 40].

A college degree is not required, but is preferred [Ex. # 2].

8. Following Faust's interview with the plaintiff, Faust determined that the plaintiff was not qualified for the position of Small Group Sales Representative. Among Faust's reasons for refusing to hire the plaintiff were the fact that the plaintiff had failed in prior sales position, he had a difficult time explaining himself to Faust, he regularly used the term "beautiful," he did not have a professional demeanor, and he did not dress properly for the interview. In addition, Faust felt that the plaintiff lacked sales aptitude because of his failure at prior sales positions, and because of his inability to sell himself [Tr. 145–51, 154–55].

The plaintiff was not considered for any other positions because he had applied for and expressed an interest in SGSR. In any event, Faust testified that there were no jobs available which met his salary expectations and which were suited to his qualifications [Tr. 152–53].

9. The plaintiff was informed of Faust's decision by a form rejection letter dated September 8, 1977 [Ex. # 5].

10. Within several weeks after the August 31, 1977, interview, Mrs. Adams from the Nebraska Job Service contacted Faust to refer plaintiff for the SGSR position. Faust told her that plaintiff had already been interviewed and was no longer being considered for the position. As a result of this conversation, the referral was never made [Tr. 161, 182].

11. Following the defendant's refusal to interview him, the plaintiff filed a discrimination charge with the local, state and federal agencies [Exs. # 6, # 7, # 8].

12. On December 14, 1977, the plaintiff again appeared at the defendant's personnel office for an interview. The plaintiff was referred to Mutual by Jessie Douglas of the Omaha Urban League. Mrs. Douglas had made an appointment for the plaintiff to meet Dorsey Seldon, Affirmative Action Coordinator and Recruiter for Mutual's personnel department.

When the plaintiff arrived at Mutual, Seldon was not able to interview him because of a conflicting appointment. The plaintiff was therefore referred by the receptionist to Charles Reuland, the defendant's employment manager. The receptionist's actions were not unusual in light of her instructions and the Mutual policy that applicants should not be kept waiting [Tr. 186–87, 213–14].

13. Reuland was aware of the plaintiff's discrimination charge against Mutual. Reuland was responsible for investigating the charge [Tr. 195, 197].

14. Reuland was given the plaintiff's original application. In keeping with his normal procedure, he asked the plaintiff whether he objected to Reuland taking notes during the interview. Since the plaintiff had no objection, notes of the interview were taken by Reuland [Tr. 187–88].

15. Although Reuland was aware of Mutual's prior rejection of the plaintiff for an SGSR position, he cannot now recall whether or not he had reviewed Faust's notes of the plaintiff's prior interview. In any event, Reuland did interview the plaintiff for approximately thirty minutes [Tr. 194, 211].

16. During the interview, Reuland asked the plaintiff about his prior work experience. The plaintiff told Reuland that he had been terminated by Prudential because he "went into the red." The plaintiff gave Reuland the name of Mr. Burnham as the person to contact at Prudential. Subsequent to the interview, Reuland contacted Burnham by phone to inquire about the plaintiff's performance at Prudential [Tr. 189–191, 211, 216].

The plaintiff's employment with Sears was also discussed. Reuland specifically asked the plaintiff why he had been termi-

nated. The plaintiff told Reuland that he did not know the reason for the termination. Reuland contacted Sears following the interview, but Sears refused to release any information on the plaintiff [Tr. 191–92].

Another topic of discussion was the one-year gap in the plaintiff's employment record. The plaintiff told Reuland that he was unemployed during this entire period, and that he received unemployment insurance benefits for six months [Tr. 191–92].

17. Since the plaintiff had not brought a transcript of his grades to the interview, Reuland told the plaintiff of the advantages of having a transcript available for review. At Mutual, it was considered the applicant's responsibility to provide a transcript. After learning of this policy, the plaintiff offered to send for a transcript [Tr. 62, 192–93, 223–224].

18. The interview with Reuland also included a discussion of what positions the plaintiff was interested in. The plaintiff expressed an interest in a position in sales or management. In addition, the plaintiff told Reuland that he had to earn Nine Hundred Dollars a month. There was no discussion of the plaintiff being placed in a clerical position [Tr. 193, 194, 225–27].

There was some confusion about the specific job for which the Urban League had referred the plaintiff. This confusion arose because the plaintiff told Reuland that he had been referred for a position called "Unit Planning." However, no such position existed at Mutual. After the interview Reuland learned from Mrs. Douglas that the plaintiff had been referred for the SGSR position [Tr. 188].

19. At the conclusion of the interview, it was understood that Reuland would contact Douglas and tell her the results of the interview. Douglas was later advised that Mutual would not be hiring the plaintiff [Tr. 196].

20. Reuland's decision not to employ the plaintiff was based on the plaintiff's salary expectations, the nature of the jobs that he expressed an interest in and his qualifica-tions displayed in the interview. In Reuland's opinion, the plaintiff was not qualified for a sales position for many of the reasons noted by Faust. Reuland noted in particular the plaintiff's lack of aggressiveness. With respect to a management position, Reuland testified that these positions were generally filled by internal promotions. Thus, there were no management positions available. Any other position at Mutual would not have fulfilled the plaintiff's salary expectations. Based on these considerations, Reuland decided that Mutual had no position to offer the plaintiff [Tr. 193–94, 197, 209, 225–28].

21. On or about June 16, 1978, Gumbert Executive Exchange, an employment agency, sent plaintiff's resume to Mutual. Several days later a follow-up call was made, at which time the employment agency was informed that the plaintiff had previously applied at Mutual and had been rejected. The Gumbert employee was also informed that the plaintiff had filed a discrimination charge against the defendant [Tr. 244].

22. The statistical evidence offered at trial reveals that, during the time period between August, 1977, and October, 1977, twenty-eight persons applied for the position of SGSR. Five, or seventeen percent, of these applicants were black. From this pool of applicants, Mutual hired four small group sales representatives. One of those hired was black. On December 30, 1977, there were twelve small group sales representatives employed by Mutual. Twenty-five percent of these representatives were black [Tr. 200–09; Exs. # 11, # 12, # 13].

*Conclusions of law*

A. *Disparate Impact*

 The plaintiff's post-trial brief raises the issue of disparate impact. The evidence, however, reveals that defendant's SGSR hiring practice did not have a disproportionate impact on blacks. Only seventeen percent of the persons applying for an SGSR position were black. However, twenty-five percent of those hired were black. It is difficult to understand how these statistics establish disparate impact. The plaintiff's reliance on statistics dealing with

rate of black terminations is inappropriate, since the plaintiff's claim of discrimination is based on the defendant's refusal to hire. The Court therefore finds that the plaintiff has failed to prove that the defendant's SGSR hiring practices have had a disparate impact on blacks.

### B. *Disparate Treatment*

■ In disparate treatment cases, the primary focus of inquiry is on the issue of whether the employer treated some employees less favorably than others because of their race or some other illegal criterion. The order of proof in such cases is well established.

First, the plaintiff must show the existence of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Const. Co. v. Waters, supra,* 438 U.S. [567] at 576 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957], *citing Teamsters v. United States,* 431 U.S. 324, 358, [97 S.Ct. 1843, 1866, 52 L.Ed.2d 396] (1977). Once a plaintiff establishes this prima facie case, the burden shifts to the employer to rebut the adverse inference by articulating "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). But even if the employer meets this burden, the complaining party is given the opportunity to show that the proffered evidence is merely a pretext for discrimination. *Id.* at 804–05 [, 93 S.Ct. 1825].

*McCosh v. City of Grand Forks,* 628 F.2d 1058, 1062 (8th Cir. 1980). Regardless of the manner of proof, the plaintiff always bears the burden of persuading the trier of fact that the defendant's actions were motivated by consideration of factors made illegal under federal law.

■ The plaintiff's prima facie showing in the instant case is extremely weak. The Court, however, need not determine whether a prima facie showing has been made, since the defendant has clearly established legitimate, nonpretextual reasons for refusing to hire the plaintiff. The Court will therefore assume that the plaintiff has made a prima facie showing of employment discrimination.

■ Faust's and Reuland's testimony describes in detail the various reasons why the plaintiff was not offered an SGSR position. This testimony also explains why plaintiff was not offered alternate employment at Mutual. The Court is of the opinion that Faust's and Reuland's explanations for the defendant's refusal to hire the plaintiff are credible. The defendant has therefore articulated a legitimate reason for its action sufficient to rebut the plaintiff's prima facie showing.

Since the defendant has sustained its burden, the plaintiff has the burden of proving by a preponderance of the evidence that the proffered explanations are a pretext for unlawful employment practices. The plaintiff has failed to sustain this burden.

■ The plaintiff has offered evidence which shows that some of the persons hired for SGSR did not have college degrees. Although the plaintiff did have a degree, the plaintiff's evidence does not prove that the defendant's refusal to hire the plaintiff was a pretext. The educational qualifications for SGSR indicate that a college degree is *preferred* but not required [Ex. # 2]. The key criteria for assessing an SGSR applicant is sales aptitude. A college degree does not show that a person has the ability to sell. Thus, the Court finds that the defendant's refusal to hire the plaintiff because of his lack of sales aptitude is not a pretext, even though the plaintiff does have a college degree and some SGSR employees do not have a degree.

The plaintiff has also offered evidence showing that several of the small group sales representatives employed by the defendant did not have related sale experience. Since these persons were hired despite the absence of related experience, the plaintiff contends that the defendant's claim that work experience was important

in its assessment of the plaintiff's qualifications is a pretext. The Court cannot agree.

The plaintiff's situation is not comparable to the situation of a person with no prior sales experience. Although the plaintiff had had prior sales experience, he admitted to both Faust and Reuland that he had been terminated at Prudential because of insufficient sales. Unlike a person without prior experience, the plaintiff's work history strongly suggested that he did not have the sales aptitude needed for SGSR. A person without related experience could have displayed sufficient sales aptitude during an interview to qualify for SGSR, despite the absence of actual experience. The Court therefore finds that the defendant's reliance on the plaintiff's prior work history as evidence of sales aptitude was not a pretext, notwithstanding the fact that other persons without any experience were hired as small group sales representatives.

The final matter raised by the plaintiff is his aptitude test scores. The evidence shows that the aptitude test scores were of very limited relevance to SGSR employment decisions. These tests did not measure sales aptitude. Since sales aptitude was the key criteria for SGSR, the mere fact that some persons hired for SGSR had lower aptitude test scores than the plaintiff does not prove pretext.

*Retaliation Claim*

The plaintiff's amended complaint alleges that the defendant's refusal to hire the plaintiff in December, 1977, was unlawful retaliation. The plaintiff has sufficiently exhausted his administrative remedies as to this claim. *Kirkland v. Buffalo Bd. of Education*, 622 F.2d 1066, 1068 (2d Cir. 1980). The Court must therefore determine whether retaliation was a motivating factor in the defendant's decision.

Although Reuland was aware of the plaintiff's discrimination charge prior to his interview with the plaintiff, the evidence fails to establish a claim of retaliation. Reuland gave the plaintiff an indepth interview which lasted approximately thirty minutes. After the interview, Reuland determined that the plaintiff was not qualified for any position which was within the plaintiff's salary expectations. Reuland has articulated a number of reasons for this decision. As was discussed above, the plaintiff has failed to prove that Reuland's explanation was a pretext. The defendant's subsequent contact with Gumbert Employment Exchange does not prove that Reuland's explanation was a pretext. The Court therefore finds that the plaintiff has failed to prove a claim of retaliation.